**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| ANGELA L. A., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:22-cv-1003 (PTG/LRV) |
| ) | |
| KILOLO KIJAKAZI, ACTING ) | |
| COMMISSIONER ) | |
| OF SOCIAL SECURITY ) | |
| ) | |
| Defendant. ) | |
| ———————————————— ) | |

## <u>REPORT AND RECOMMENDATION</u>

This matter is before the undersigned magistrate judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment.  (Dkt. Nos. 18, 21.) Pursuant to 42 U.S.C. § 405(g), Plaintiff Angela L. A. seeks judicial review of the final decision of Kilolo Kijakazi, Acting Commissioner of the Social Security Administration ("Commissioner"), denying her claim for disability insurance benefits ("DIB") under the Social Security Act.  The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Appellate Operations ("Appeals Council") that Plaintiff was not disabled as defined by the Social Security Act and applicable regulations. For the reasons stated below, the undersigned recommends that the Court **DENY** Plaintiff's Motion for Summary Judgment (Dkt. No. 18), **GRANT** Defendant's Motion for Summary Judgment (Dkt. No. 21), and **AFFIRM** the ALJ's decision.[1]

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C).  (*See* Dkt. No. 10.)   In accordance with those rules, this Report and

1

## I.    PROCEDURAL HISTORY

On October 12, 2020, Plaintiff applied for DIB with an alleged onset date ("AOD") of June 1, 2018 due to the following alleged impairments: Depressive, anxiety, insomnia disorder; degenerative arthritis of the lumbar spine with intervertebral disc syndrome ("IVDS"); degenerative arthritis of the cervical spine with IVDS; left knee retro patellar pain syndrome; degenerative arthritis in the right knee; radiculopathy (right leg); radiculopathy (left upper extremity); right shoulder strain; trochanteric pain syndrome (left and right hip); and bilateral planter fasciitis with degenerative arthritis.  (AR 68, 184.)   On June 1, 2021, the Social Security Administration ("SSA") denied Plaintiff's application.  (AR 67, 75–76.)   On August 4, 2021, Plaintiff requested reconsideration of the denial, and on November 4, 2021, the SSA affirmed its denial.  (AR 77, 87.)   On January 4, 2022, Plaintiff appointed non-attorney Andrew Mathis, of Mathis & Mathis, as her representative and requested a hearing before an ALJ.  (AR 99–105.)

On April 21, 2022, ALJ Michael Krasnow conducted a hearing via online video conference.  (AR 32.)  Plaintiff provided testimony and answered questions posed by the ALJ and her representative.  (AR 34 *et seq*.)  A vocational expert ("VE") also answered questions from the ALJ and Plaintiff's representative.  (AR 38 *et seq*.)  On May 10, 2022, the ALJ issued a decision finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act.  (AR 25.)  On May 26, 2022, Plaintiff requested a review of the ALJ's decision by the Appeals Council.  (AR 299.)  The Appeals Council denied Plaintiff's request on July 12, 2022, finding no reason under its rules to review the ALJ's decision.  (AR 1–3.)   As a result, the ALJ's decision became the final decision of the Commissioner.  (AR 1); *see* 20 C.F.R. §§ 404.981, 416.1481.

---

Recommendation excludes any personal identifiers such as Plaintiff's social security number and date of birth (except for the year of birth).  The discussion of Plaintiff's medical information is limited to the extent necessary to analyze the case.

Plaintiff was given sixty days to file a civil action challenging the decision.  (AR 2); *see* 20 C.F.R. §§ 404.981, 416.1481.

On September 6, 2022, Plaintiff filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. 405(g).  (Dkt. No. 1.)  On December 19, 2022, the Court set a briefing schedule for the parties' cross-motions for summary judgment, and on January 6, 2023, the Court extended the original briefing schedule.  (Dkt. Nos. 15, 17.)  On January 13, 2023, Plaintiff filed her Motion for Summary Judgment.  (Dkt. No. 18.)  On February 10, 2023, Defendant filed her Cross-Motion for Summary Judgment.  (Dkt. No. 21.)  Plaintiff filed a Reply on March 2, 2023.  (Dkt. No. 24.)  Both parties waived oral argument on their respective motions.  (Dkt. No. 20, 23.)  The parties' motions are now ripe for disposition.

## II.    FACTUAL BACKGROUND

### A.  Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1968 and was fifty years old at the time of the alleged onset disability. (AR 68.)  Plaintiff attended college and has a Master's degree.  (AR 35, 218.)  From approximately 1986 through May 2018, Plaintiff served in the United States Army.  (AR 37, 218–29, 793.) Plaintiff was deployed to Afghanistan in 2009.  (AR 36.)  During her deployment, Plaintiff worked with engineering units and performed human resource duties.  (AR 36–37, 39.)  Most recently, from July 2013 through May 2018, Plaintiff served as a Chief of Human Capital, Operations Division, in the U.S. Army Reserves.  (AR 37, 75.)  Plaintiff's last day of service was May 31, 2018.  (AR 37.)   Plaintiff retired because she was not eligible for promotion; she received an honorable discharge upon retirement.  (AR 37–38.)

**B.  Record Evidence of Plaintiff's Medical History and Treatment**

The following is a summary of the relevant record evidence before the ALJ regarding Plaintiff's medical history and treatment.[2]

On August 3, 2018, the VA transmitted a letter to Plaintiff detailing its determination that Plaintiff had a combined disability rating of 100%.  (AR 179–80.)  Plaintiff's service-connected impairments, effective June 1, 2018, include the following: a pain syndrome of both hips, right shoulder strain, tendonitis in both ankles and both wrists, bilateral plantar fasciitis with degenerative arthritis in the left foot, degeneration of the left eye, tinnitus, asthma, retropatellar pain syndrome of the left knee, degenerative arthritis of the lumbar and cervical spine with IVDS, radiculopathy of the left upper extremity and right lower extremity, gastroesophageal reflux disease (GERD), degenerative arthritis of the right knee, and an unspecified depressive, anxiety, insomnia disorder.  (AR 180–81.)

On August 27, 2018, Plaintiff was seen for an initial primary care visit at the Washington VA Medical Center.  (AR 789.)  During the visit, Plaintiff denied "joint swelling, redness, pain" and also denied "depression, anxiety, unusual stress."  (AR 790.)  Plaintiff reported that her baseline level of pain was "being actively treated to [her] satisfaction" and no changes were required.  (AR 792.)  Plaintiff declined a referral to the VA or other weight loss program, and also declined a referral for Mental Health services.  (AR 791.)

On September 5, 2018, Plaintiff was evaluated by her primary care physician, Luzmira Torres, M.D.  (AR 784.)  During the visit, Plaintiff denied joint swelling, redness, and pain, and

---

[2] The AR contains over 1,000 pages of medical records from various sources relating to Plaintiff's medical treatments.  This summary provides an overview of Plaintiff's medical treatments and conditions relevant to her claims and is not intended to be an exhaustive list of every medical treatment.

also denied having depression, anxiety, or unusual stress.  (AR 785–86.)  Dr. Torres noted that Plaintiff was in "[n]o acute distress," had "[g]rossly normal movement with intact sensation," and had "[g]ood balance/coordination and gait."  (AR 786.)  Dr. Torres also noted that Plaintiff was in a "[n]ormal mood with NO anxiety/depression noted."  (AR 786.)  Dr. Torres recommended that Plaintiff return to the clinic for an exam the next year, or sooner as needed.  (AR 787.)

On July 25, 2019, Dr. Torres saw Plaintiff for a routine exam.  (AR 593.)  Dr. Torres noted that Plaintiff reported "joint / back pain" and recommended conservative management including physical therapy for Plaintiff's osteoarthritis/degenerative joint disease/degenerative disc disease.  (AR 595–96.)  During the visit, Dr. Torres observed that Plaintiff was in "[n]o acute distress," had no edema, had "[g]rossly normal movement with intact sensation," had "[g]ood balance/coordination and gait," and had a "[n]ormal mood" with no "anxiety/depression noted."  (AR 595–96.)  Additionally, Plaintiff reported that her anxiety had "improved since Retirement" and Dr. Torres noted that Plaintiff had a "good [support] system."  (AR 593, 596.)  Dr. Torres ordered an X-ray and referred Plaintiff to physical therapy for evaluation and treatment.  (AR 596, 583.)

The August 2019 X-ray ordered by Dr. Torres indicated that Plaintiff had (1) degenerative changes at the AC joint; (2) normal bilateral hips; (3) mild degenerative changes of both knees; and (4) mild degenerative changes of the cervical spine and degenerative changes in the lumbar spine.  (AR 335–43, 581–82.)  X-rays of Plaintiff's feet also indicated that Plaintiff had moderate degenerative changes in both feet at the great toe metatarsaophalangeal (MTP) joints.  (AR 343.)  Dr. Torres recommended that Plaintiff "continue with plan for Physical Therapy as well as conservative management (stretching, maintaining a healthy weight, regular Low or NO impact exercises and anti-inflammatory medications only as needed)."  (AR 582.)

On August 5, 2019, Plaintiff presented to podiatrist, Dr. Melinda Zellars for custom molded orthotics to treat her plantar fasciitis and knee problems.  (AR 587–88.)  Plaintiff denied joint swelling, redness, and pain in her back, hips, and ankles.  (AR 588.)  Plaintiff reported that she was experiencing anxiety and unusual stress.  (*Id.*)  Upon examination, Plaintiff had ankle instability, low arches and valgus deformity, but she had 5/5 muscle strength, intact sensation, and no pain with ankle and foot range of motion.  (AR 588–89.)  Dr. Zellars ordered a bone length scanogram, which indicated that Plaintiff had a leg length discrepancy of less than two milometers (AR 335), and also ordered over the counter insoles and one pair of custom compression socks "for moderate walking and exercise."  (AR 589.)  Dr. Zellars ordered a follow-up exam for three months later for a reevaluation.  (AR 589.)

From August 2019 through October 2019, Plaintiff engaged in physical therapy at Pivot Physical Therapy.  (AR 1155–85.)  Plaintiff was provided with a TENS unit and compression stockings.  (AR 579.)  On September 27, 2019, Plaintiff reported to Dr. Torres that she had "been attending physical therapy in Woodbridge, VA twice a week and it seems to be helping."  (AR 576.)  Plaintiff also requested that Dr. Torres refer her to a chiropractor for her hips and back.  (*Id.*)  In a discharge note on October 16, 2019, Plaintiff's physical therapist noted that Plaintiff had "progressed well towards previously stated goals" and that she "feels she is ready for" discharge.  (AR 1155–56.)

On October 16, 2019, Plaintiff sought treatment from a chiropractor, who "discussed the prognosis of mechanical [lower back pain]" and the potential risks and benefits of chiropractic treatment with Plaintiff, and advised her to stay active.  (AR 573.)  Upon a lumbar examination, the chiropractor reported Plaintiff had limited flexion with pain upon all range of motion, as well

as provoked local hip pain, but that her strength was a 5/5 for all left and right hip, knee, and foot tests.  (AR 572–73.)

On December 9, 2019, Plaintiff presented to Spine & Sport Rehabilitation for evaluation and treatment of lower back pain, which she reported extended outward to the sides of her hips. (AR 301.)  Various orthopedic tests revealed that Plaintiff had moderate to severe pain, core weakness, symptoms of sciatica on the right side, tightness in her hip flexors, restricted hip extension on both sides, and weakened gluteal muscles.  (AR 301–02.)  Plaintiff was treated through physical therapy rehabilitation sessions twice per week.  (AR 305–16.)  On February 4, 2020, Plaintiff reported that "her lower back pain levels ha[ve] significantly reduced with treatment" and that "she is able to perform many more activities now than prior to initiating treatment, due to her pain levels decreasing."  (AR 316.)  It was noted that Plaintiff improved 50% since her initial visit.  (*Id.*)

On April 21, 2020, Plaintiff inquired about a referral for behavioral health treatment, and also reported increased pain in both knees.  (AR 559.)  On May 4, 2020, Plaintiff saw a kinesiotherapist via a telehealth appointment for knee weakness and pain.  (AR 555–56.)  At the time of the appointment, Plaintiff reported a pain level of 2/10, with a highest pain level of 8/10. (AR 556.)  Plaintiff reported that she was experiencing difficulty with ascending/descending stairs, walking long distances, and that her pain significantly compromised her ability to engage in physical activities such as basketball, softball, and golf.  (AR 558.)  Upon a visual examination, the kinesiotherapist reported that Plaintiff had limited flexion in her knees, but that her sitting and standing balance was excellent, and that she had independent functional mobility.  (AR 557.)  The kinesiotherapist submitted an order for two wrap-around hinged knee braces and provided Plaintiff

with home exercises to increase knee strength.  (AR 558.) The kinesiotherapist reported that "[r]ehab potential for [Plaintiff] [was] very good." (*Id.*)

On June 1, 2020, Plaintiff had a virtual follow-up appointment with the kinesiotherapist, who noted that Plaintiff was "[p]rogressing well toward [her] stated goals" of increased knee strength and recommended that Plaintiff continue with home exercises and daily walking.  (AR 553.)  On June 9, 2020, Plaintiff had another virtual appointment with the kinesiotherapist, who reported that Plaintiff reported 3–4/10 pain for lower back and 1–2/10 pain in her knees.  (AR 550.)  The kinesiotherapist advised Plaintiff to continue home exercises for her knee and provided exercises to alleviate back pain.  (AR 550.)  A kinesiotherapy discharge note from July 21, 2020 indicated that Plaintiff had generally "met [her] stated goals" with respect to increased knee strength and reduced pain, that "stair ambulation was reported less difficult to negotiate," and that Plaintiff reported improvement in her ability to perform physical activities and to walk a mile under 10 minutes.  (AR 544–46.)

On August 22, 2020, Plaintiff had a telehealth appointment with psychologist Sarah R. Cunningham through the VA's Mental Health Services Line, during which Plaintiff detailed her history with anxiety, as well as associated functional impairments including "difficulty sleeping and problems interacting with others."  (AR 542.)  A diagnosis of Generalized Anxiety Disorder was noted.  (*Id.*)  In a mental health services consult request from April 2020, Dr. Torres indicated that Plaintiff was a "52yo female Veteran with Mood/Anxiety/Depression/Insomnia and desire for counseling," with no suicidal or homicidal ideations.  (AR 398.)  On September 30, 2020, Plaintiff had a second telehealth appointment with Sarah Cunningham, during which Plaintiff denied thoughts of self-injurious behavior or being in mental health crisis.  (AR 538–39.)   The appointment focused on addressing symptoms of Plaintiff's anxiety and depression, such as

through mindfulness exercises.  (AR 539.)  On October 3, 2020, Plaintiff had a third session with Sarah Cunningham at which she discussed her ongoing anxiety, including about an upcoming golf tournament with fellow veterans "due to discomfort being in public spaces."  (AR 538.)  Plaintiff's final session with Sarah Cunningham was on October 10, 2020, during which Plaintiff reported positive emotions after participating in a golf tournament.  (AR 536.)  Plaintiff expressed her "desire to be seen at Fort Belvoir for long-term psychotherapy for anxiety."  (*Id.*)  In all four sessions, it was noted that Plaintiff's "[i]nsight and judgment appeared to be good," and that her "[f]low of ideas and thought content was within normal limits."  (AR 537–39, 543.)

On December 16, 2020, Dr. Torres conducted a virtual visit with Plaintiff at which Plaintiff indicated she had joint and back pain.  (AR 531.)  Dr. Torres reported that Plaintiff had a normal mood, was in no acute distress, had grossly normal movement of her extremities, and was alert and oriented with no anxiety or depression noted.  (AR 529, 531.)  Dr. Torres noted that Plaintiff's ongoing anxiety was being addressed through behavioral health counseling.  (AR 532.)

On December 19, 2020, Dr. Torres discussed with Plaintiff the results of the X-rays on her knees.  (AR 511, 522.)  The X-rays indicated that Plaintiff had mild osteoarthritis in both knee joints that was unchanged since the prior X-rays on August 5, 2019.  (AR 326, 511–12, 522.)  Dr. Torres referred Plaintiff to an orthopedic specialist and recommended that Plaintiff "continue with conservative management (stretching, maintaining a healthy weight, regular Low or NO impact exercises and anti-inflammatory medications only as needed)."  (AR 522.)  In her January 2021 consult request, Dr. Torres noted that Plaintiff had "worsening bilateral knee pain" and had "previously completed conservative options."  (AR 359.)

From March 2021 through October 2021, Plaintiff participated in aquatic therapy.  (AR 810–77.)  Notes from Plaintiff's initial examination indicated that she "would benefit from skilled

physical therapy" to increase knee strength and stability, decrease pain, improve functional ability, and educate her on home exercise programs.  (AR 875.)  From May 2021 to August 2021, Plaintiff reported back to Spine & Sport Rehabilitation presenting with lower back pain.  (AR 1186–97.) Plaintiff reported that she had difficulty walking, standing, and sitting.  (AR 1186.)  A treatment note from August 17, 2021 stated that Plaintiff's lower back pain "continues to improve" and that she had "improved 50% since [her] initial visit."  (AR 1197.)

On August 11, 2021, Dr. Torres spoke over the phone with Plaintiff regarding her anxiety/depression/mood swings/insomnia; her notes indicate that Plaintiff "note[d] increased moodiness with roommates" and that she would "like to discuss meds options."  (AR 904.)  On August 18, 2021, Plaintiff underwent a psychological evaluation at the Alexandria Vet Center for her PTSD symptoms, including anxiety and hypervigilance.  (AR 1566, 1583–84.)  During her initial intake, it was reported that Plaintiff had a friendly and cooperative manner, was oriented to time, place, and person, had normal memory, was relaxed and at ease, and had good judgment. (AR 1566–67.)  In a questionnaire dated August 18, 2021, Plaintiff reported that she had "been thinking clearly" "often," and that she was "feeling optimistic about the future" and "dealing with problems well" "some of the time."  (AR 1576.)  Plaintiff continued one-on-one psychotherapy sessions at the Vet Center once per month for the next six months; during each appointment, it was noted that Plaintiff was in a "cooperative, anxious mood with affect in fair range."  (AR 1578–84.) A VA staff psychiatrist note from a November 16, 2021 telephone call with Plaintiff indicated that Plaintiff "sounded calm," was "in no acute distress," had fair insight and judgment; and reflected that that Plaintiff was taking Sertraline (50 mg/day) for PTSD and Trazadone (25-100 mg/day) for sleep.  (AR 1311–15.)

On September 1, 2021, Dr. Torres forwarded the results of Plaintiff's August 31, 2021

radiology exams to her.  (AR 903.)  Dr. Torres noted the results as follows:

- Bilateral X-ray of the wrists: Normal

- MRI of the cervical spine: "Mild degenerative changes of the cervical spine."

- MRI of the right ankle: "1. Anterior talofibular ligament is not well visualized, indicating tear.  2. Moderate tenosynovial effusion of flexor hallucis longus tendon from the level of distal tibia through midfoot.  3. Bone marrow edema about the second and third tarsometatarsal joints, degenerative.  Additional presumed degenerative changes at the navicular-medial and middle cuneiform articulations and calcaneal-cuboid articulation.  4. Small to moderate effusion of tibiotalar joint."  (AR 903–04.)

In the same correspondence, Dr. Torres stated that she was referring Plaintiff to neurology for the cervical spine/neck and that Plaintiff should self-refer for podiatry assistance; in the meantime, Dr. Torres stated that Plaintiff should "continue with conservative management," including stretching, maintaining a healthy weight, engaging in regular low- or no-impact exercise, and taking ant-inflammatory medications as needed.  (AR 903.)

On September 3, 2021, Plaintiff consulted with Dr. Torres via telephone regarding her MRI results.  (AR 896.)  Dr. Torres told Plaintiff that her ankle MRI indicated a tear and effusion for which Plaintiff agreed to seek podiatry assistance.  (*Id.*)  Dr. Torres also noted that Plaintiff was alert and oriented with a normal mood and no anxiety or depression noted, and that Plaintiff would continue with her plan for behavioral health management.  (AR 897.)

On September 15, 2021, Plaintiff was examined by podiatrist Steven McIlwain. (AR 885.) During the visit, Plaintiff reported that she experienced pain in her right foot when walking.  (AR 887.)  Dr. McIlwain noted that Plaintiff had improper alignment of her pes planus in the standing

position, but that he did not observe any swelling.  (AR 887.)  Plaintiff was instructed to get X-rays and an MRI on her right foot.  (*Id.*)

On October 14, 2021, Plaintiff had an MRI of her right knee. (AR 1289.)  On October 17, 2021, Dr. Torres forwarded the results of the MRI to Plaintiff, and stated that the MRI indicated "[m]oderate grade cartilage loss of the weightbearing surface of medial femoral condyle," "[h]igh-grade cartilage loss of the median ridge and medial facet of patella," "[l]ow-grade cartilage loss of medial trochlea," "[m]ild edema of suprapatellar fat pad," and "[s]mall knee joint effusion."  (AR 1333–34.)  Dr. Torres wrote that it "is recommended that you continue with conservative management." (AR 1334.)

On October 22, 2021 Plaintiff received an MRI of her right ankle.  (AR 1288–89.) Plaintiff's podiatrist, Dr. McIlwain, determined that the MRI showed "mid foot arthritis with Cystic formation midfoot on MRI." (AR 1322.)  Dr. McIlwain instructed Plaintiff to use an arch binder for support, informed Plaintiff of possible surgical intervention for the cystic formation, and noted that Plaintiff should return in 3–4 months.  (*Id.*)

In October and November 2021, Plaintiff engaged in occupational therapy for her wrist pain. (AR 1324–26, 1328–30, 1331–33, 1335–39.)  Tests indicated that Plaintiff had 5/5 strength in her upper extremities.  (AR 1337.)  The treatment notes state that Plaintiff continued to experience pain and that she could benefit from additional occupational therapy, but that Plaintiff declined additional occupational therapy treatment.  (AR 1325–26.)

In a telephone encounter note from October 27, 2021, Dr. Torres noted that Plaintiff reported that the "TENS unit [was] helpful" for her cervical spine, and that she "would like to be referred to" Ideal Wellness for physical therapy, which was recommended by a neurologist.  (AR 1327.)  In October and December 2021, and January 2022, Plaintiff presented to neurologist Dr.

Mohammad Labbaf with stiffness and pain in her shoulder and neck.  (AR 1351, 1354, 1357.)  Dr. Labbaf observed that Plaintiff had no abnormal movements with respect to her coordination, had a normal gait and normal toe, heel and tandem walking.  (AR 1352, 1355, 1358.)

In January 2022, Plaintiff had a CT scan of her right foot, which indicated "[d]egenerative changes at the great toe MTP joint" and "[s]mall dorsal osteophyte at the anterior aspect of the ankle mortise joint at the talus."  (AR 1284.)  In February 2022, Plaintiff consulted an attending podiatric surgeon, Dr. Toni Lam, for her right ankle and foot pain.  (AR 1295.)  Plaintiff noted that she experiences increased swelling in her lower extremities when driving over 1.5 hours, and that she only used her compression stockings for long drives or flights.  (AR 1295.)  Plaintiff denied pain when walking up and down stairs.  (AR 1295.)  Dr. Lam reviewed the MRI imaging with Plaintiff and recommended exhausting conservative treatment before considering surgery "if she begins to have increas[ed] frequency of ankle sprains."  (AR 1296.)

### C.  Summary of Opinion Evidence Before the ALJ

On February 27, 2021, Plaintiff was examined by Dr. Farzal, M.D. at the request of the SSA.  (AR 800–07.)  Plaintiff appeared to be alert, had good eye contact and fluent speech, had an appropriate mood, had clear thought process, her memory was normal and her concentration was good, and she was oriented to time, place, person and situation.  (AR 804.)  Upon examination, Dr. Farzal observed no clubbing, discoloration or swelling in her extremities, and he recorded her strength in all muscles as 5 out of 5, with the exception of her left deltoid and right leg flexion, which received scores of 4 out of 5.  (*Id.*)  Dr. Farzal noted "tenderness to palpation of the left shoulder" but noted no joint swelling, erythema (reddening) or deformity.  (AR 805.)  Dr. Farzal found that Plaintiff was able to "lift, carry and handle light objects" and that her "[f]ine and gross manipulative abilities were grossly normal."  (*Id.*)  Dr. Farzal also reported that Plaintiff was not

able to squat and rise from that position, but that she "was able to rise from a sitting position without assistance and could get up and down from the exam table with ease." (*Id.*) Further, Plaintiff could "walk on heels and toes with ease," and her tandem walking was normal. (*Id.*) Plaintiff could stand on her right foot only but could not hop on just one foot on either side. (*Id.*) Dr. Farzal reported that Plaintiff's likely diagnoses include: (1) "[a]rthritis of the knees, hips, and lumbar spine"; (2) "[l]eft shoulder sprain"; and (3) sciatica. (AR 806.)

On March 8, 2022, at the request of Plaintiff, Dr. Torres examined Plaintiff by video and provided a medical opinion. (AR 1556.) During the examination, Plaintiff reported her own limitations with reaching, manipulation, pushing and pulling, lifting, and postural movements. (AR 1557.) Dr. Torres observed Plaintiff's inability to demonstrate squatting and kneeling, and also noted that Plaintiff had a decreased range of motion of her upper extremities. (AR 1559.) Dr. Torres also observed that Plaintiff was in no acute distress, had a sad demeanor, and that her judgment and insight were fair/intact. (AR 1559.) Plaintiff reported that her pain intensity was 8–10 out of 10, and that it was only minimally improved with medications, stretching, and rest. (AR 1557.) Dr. Torres reported that Plaintiff was subjectively credible and that "objectively, imaging confirm pathology which could cause symptoms as delineated." (*Id.*) Dr. Torres stated that Plaintiff's "[c]urrent disabilities and treatment schedule would require absences from work . . . [m]ore than 3 times weekly," and that Plaintiff "would probably require greater than 3 daily breaks based on exacerbation of symptoms." (*Id.*) Further, Dr. Torres noted that "due to PTSD and associated symptoms," Dr. Torres "would recommend": "[n]oise cancelling devices"; "[r]epositioning office space to -NO or Low- traffic areas, preferably with a wall"; and "[o]pportunities to go to a calm/quiet area for recovery whenever symptoms are aggravated." (AR 1558.)

One day earlier, on March 7, 2022, Dr. Torres spoke with Plaintiff over the phone regarding her disability application.  (AR 1560–61.)  Dr. Torres reported that Plaintiff suffers from "Post Traumatic Stress Disorder/Anxiety/Insomnia/Mood disorder," "Degenerative Disc Disease (cervical/thoracic/lumbar spine)," and "Osteoarthritis (feet/ankles/knees/hips/hands)"; that Plaintiff was compliant with referrals to physical and occupational therapy and attended appointments 1–2 times weekly; that Plaintiff's diagnoses were confirmed by exam and imaging; that Plaintiff's mobility was limited by constant pain; that Plaintiff's symptoms do not require laying down, but that she should be allowed an opportunity to stretch or change positions; and that Plaintiff has been diagnosed with PTSD and should be "given opportunities to go to a calm/quiet area for recovery whenever symptoms are aggravated."  (AR 1561–62.)

### D.  Testimony at the Administrative Hearing

At the video hearing on April 21, 2022, Plaintiff appeared with her non-attorney representative before the ALJ.  (AR 32.)  Plaintiff was fifty-four years old, 5'9" tall, and weighed 255 pounds.  (AR 34–35.)  Plaintiff testified that she had not worked since her AOD of June 1, 2018 but that she had applied for civil service positions after that date.  (AR 40–41, 50.)

In terms of her day-to-day activities, Plaintiff testified that she lives in a house by herself, that she has a driver's license, and that she drives approximately four times per week.  (AR 35.) Plaintiff testified that she can shower/bathe, get dressed, prepare meals, clean, do laundry, grocery shop, and perform other household tasks without assistance.  (AR 44–45, 47–48.)  Plaintiff testified that she often tries to make "quick meals" that don't "take a lot of preparational work" due to her inability to stand for long periods of time, and has meals delivered one or two times per week. (AR 48.)  Plaintiff stated that she engages in volunteer activities approximately once per month, including at an adaptive golf rehabilitation program for disabled veterans where she helps to

register participants and completes other tasks.  (AR 41.)  Plaintiff stated that she occasionally

visits with friends, and that the last time she played sports was approximately four years ago.  (AR

46, 57–58.)[3]

Plaintiff testified that she has depression, anxiety, insomnia, gets easily agitated, has

trouble focusing, and easily forgets things.  (AR 55–57.)  Plaintiff testified that she noticed a

decline in her ability to focus and remember things "later in . . . [her] career," which "has not

improved much" since she "stopped working."  (AR 55–56.)[4]  Plaintiff testified that she has "bad

days" six or seven times per month during which she mostly stays in her bedroom at her house,

and that she has "good days" approximately twice per month during which she feels good enough

to socialize with family or friends.  (AR 49.)  In response to a question about how her PTSD

symptoms affect her day-to-day life, Plaintiff testified that she suffers from hypervigilance.  (AR

56–57.)  The ALJ asked Plaintiff about treatment she is receiving for her mental health issues, to

which Plaintiff responded that she had seen a psychologist and a psychiatrist and takes two

medications: trazodone and sertraline.  (AR 42.)  Plaintiff stated that she experienced "a little

drowsiness" from the medication she takes.  (AR 43.)

The ALJ asked about treatment Plaintiff receives for her neck, wrists, and other physical

health issues.  (AR 42.)  Plaintiff stated that she was seeing a neurologist for her neck, undergoing

---

[3] The record contains two Function Reports from Plaintiff from January 2021 and October 2021.
(AR 232, 260.)  Although the October 2021 Function Report is mostly consistent with Plaintiff's
testimony during the administrative hearing, the January 2021 Function Report is somewhat
inconsistent with the October 2021 Report and Plaintiff's testimony.  Specifically, in the January
2021 Report, Plaintiff reported that her daily activities included reading and responding to emails,
returning phone calls, running errands, occasionally walking, and cleaning her kitchen; these
activities are omitted from her October 2021 Report.  (AR 233, 261.)

[4] Similarly, in an October 2021 Function Report, Plaintiff reported that her limitations require her
to take "constant breaks while performing . . . tasks which takes [her] longer to complete.  In [her]
previous job[,] this would make it difficult to finish projects on time."  (AR 260.)

16

physical therapy for her neck and right ankle, and received shots in her knees every couple of months.  (AR 42.)  Plaintiff testified that she has used custom compression stockings, a compression device on her ankle, and a medical binder on her foot, to manage swelling in her lower extremities.  (AR 51–52.)  Plaintiff stated that she elevates her legs and uses ice packs to treat swelling every other day, during the daytime hours and at night, for at least an hour per day. (AR 52–53.)  Plaintiff further testified that she "do[es] a lot of stretching exercises" and uses a TENS unit to manage her pain levels.  (AR 51–52, 54.)

Plaintiff testified that her physical condition has worsened since June or July of 2018 in that she currently experiences more chronic pain, including in her back, neck, hands, knees, and ankles.  (AR 50–51.)  Plaintiff described that the pain in her knees is exacerbated by "standing, going upstairs, just general walking, [and] bending."  (AR 51.)  Plaintiff further stated that the swelling in her ankle "has become more frequent to the point where" she has to use a compression device "on a daily basis."  (AR 51.)  Regarding her present physical capabilities, Plaintiff testified that she could lift up to 10 pounds, walk at least a block, stand for at least 15 minutes at a time, and sit for at least 45 minutes at a time.  (AR 43.)[5]

In testimony from the VE, it was established that Plaintiff's prior work experiences were combined jobs or composite jobs with Specific Vocational Preparation levels of six, seven, or eight.  (AR 59.)  The ALJ then described the following hypothetical person for the VE to consider: The hypothetical individual had the Plaintiff's age, education, and prior work experience and was limited to a light exertion level, with the additional limitations that the person could stand and/or walk for a total of four hours in an eight-hour day; sit up to six hours in that same day; occasionally

---

[5] In her October 2021 Function Report, Plaintiff stated that she could lift 10-15 pounds, sit and stand no longer than 30 minutes, and walk 0.25 miles or 20-30 minutes without experiencing pain and/or needing to rest.  (AR 265.)

push and/or pull with the right lower extremity; occasionally climb ramps and stairs, climb ropes, ladders, and scaffolds; stoop, kneel, crouch and crawl; frequently reach overhead bilaterally; and frequently handle bilaterally. (AR 59–60.) The VE testified that the following positions existed in the national economy that satisfied the limitations set forth by the ALJ: price marker (40,000 jobs), package marker (50,000 jobs), routing clerk (65,000 jobs). (AR 60.) The VE testified that all three jobs would remain in the same numbers even if the same hypothetical individual could perform simple routine tasks but with no production rate for pace of work and could tolerate occasional interaction with the general public. (AR 60.) The VE further testified that if a hypothetical individual "required the option to alternate between a sitting and standing position an average of every 30 minutes, assuming he or she remained on task, [such that] the person might stand for 15 minutes, sit for 45 minutes, so on and so forth, throughout the workday," the three positions would still remain available.[6] (AR 61.)

In response to additional questioning by Plaintiff's representative, the VE testified that if the hypothetical individual was required to take "extra breaks that fall out of" a typical break pattern, i.e., the breaks were "unscheduled, unplanned, and needed to be taken immediately," that the individual would not be able to maintain competitive employment. (AR 62.) Finally, the VE testified that if the hypothetical person had additional upper extremity handling limitations and was unable to interact occasionally with the general public, that "there would be no jobs." (AR 64–65.)

---

[6] The VE testified that the DOT and accompanying publications do not address sit/stand options for these positions, but that the VE's responses to these portions of the hypotheticals were based upon the VE's training and experience. (AR 62.)

### E.  The ALJ's Decision on May 10, 2022

On May 10, 2022, the ALJ issued a decision that Plaintiff was not disabled under Sections 216(i) and 223(d) of the Social Security Act based on her application for DIB for the AOD of June 1, 2018 to the date of the decision.  (AR 12–13.)  When determining whether an individual is eligible for DIB, the ALJ is required to follow a five-step sequential evaluation.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  Courts use this same process when assessing whether the ALJ applied the correct legal standards and whether the ALJ's final decision is supported by substantial evidence.  *See id.*

The ALJ must consider whether a claimant: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform past relevant work; and (5) if unable to return to past relevant work, whether the claimant can perform other work that exists in significant numbers in the national economy. *See id.*; *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).  The claimant bears the burden to prove disability for the first four steps of the analysis.  *See id.*  The burden then shifts to the Commissioner at step five.  *See id.*; *see also McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983).  When considering a claim for DIB, the Commissioner must also determine whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met.  *See* 42 U.S.C. §§ 416(i), 423. The regulations promulgated by the SSA provide that all relevant evidence will be considered in determining whether a claimant has a disability. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3).

Here, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since Jun 1, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: osteoarthritis, degenerative disc disease, plantar fasciitis with pes planus, and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, [the ALJ] find[s] that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can stand and/or walk for a total of 4 hours and sit up to 6 hours in an 8-hour workday.  She can occasionally push and/or pull with right lower extremity.  She can occasionally climb ramps and stairs; climb ladders, ropes, or scaffolds; stoop; kneel; crouch; and crawl.  The claimant can frequently reach overhead and handle bilaterally.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on March 29, 1968 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2018, through the date of this decision (20 CFR 404.1520(g)).[7]

(AR 14–25.)  The Appeals Council provided a written response to Plaintiff's claims for why she disagreed with the ALJ's decision and found no basis for changing the ALJ's decision.  (AR 1–4, 176–78, 299.)

---

[7] The ALJ also correctly noted that Plaintiff's VA disability rating of 100% "is inherently neither valuable nor persuasive" pursuant to 20 CFR 404.1520b.  (AR 23.)

## III.   STANDARD OF REVIEW

"A reviewing court 'must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard.'" *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 353 (4th Cir. 2023) (quoting *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  It consists of "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3d at 176 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).  In determining whether a decision is supported by substantial evidence, the Court does not undertake to "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Shelley C.*, 61 F.4th at 353 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  The Court, however, must consider "whether the ALJ examined all relevant evidence and offered a sufficient rationale in crediting certain evidence and discrediting other evidence." *Id.* (citing *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998)).

## IV.   ANALYSIS

Plaintiff's Motion for Summary Judgment asserts that the Commissioner's decision should be reversed for one reason: the ALJ failed to properly assess the supportability of Dr. Torres's opinions under 20 C.F.R. § 404.1520c, and therefore, the ALJ erred in finding that Dr. Torres's opinions were unpersuasive.[8]  (Dkt. No. 19 at 6–7, 9.)  Specifically, Plaintiff contends that in

---

[8] In a single sentence on the final page of her opening brief, Plaintiff asserts that "this Court cannot find that the residual functional capacity is supported by substantial evidence." (Dkt. No. 19 at

analyzing Dr. Torres's opinions, the ALJ improperly relied on "three outlier treatment sessions that do not fully consider the extent of Ms. Andrew's medical conditions" and "failed to address" a "great chunk of objective evidence" that otherwise supported Dr. Torres's opinion.  (*Id.* at 10.) Accordingly, Plaintiff asserts that the ALJ's finding regarding the supportability of Dr. Torres's opinion is not supported by substantial evidence and that the Commissioner's decision should be reversed.  (*Id.* at 11.)   In response, Defendant asserts that the ALJ properly assessed the supportability of Dr. Torres's opinion because the ALJ "expressly stated that Dr. Torres's opinion was not supported by the evidence and identified Dr. Torres's treatment notes that were inconsistent with her opinion."  (Dkt. No. 22 at 16.)  Additionally, even if Plaintiff is correct that the record contains additional treatment notes from Dr. Torres that would support her opinions, the ALJ's conclusions are nevertheless supported by substantial evidence and should be affirmed. (*Id.*)

As further explained below, the undersigned finds that the ALJ's decision should be affirmed because: (1) the ALJ applied the correct legal standard when evaluating the persuasiveness of Dr. Torres's opinions, and (2) substantial evidence supports the ALJ's conclusion that Dr. Torres's opinions were not well-supported.  *Cf. May v. Comm'r of Soc. Sec. Admin.*, 920CV02197MGLMHC, 2021 WL 7286833 (D.S.C. Oct. 6, 2021), *report and recommendation adopted sub nom. May v. Kijakazi*, 9:20-02197-MGL, 2022 WL 593957 (D.S.C.

---

11.)  Apart from arguing that the ALJ erred in analyzing Dr. Torres's opinions, however, Plaintiff fails to develop any argument that the residual functional capacity is not supported by substantial evidence; therefore, she has waived that issue before this Court.  *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to 'develop [the] argument'—even if [the] brief takes a passing shot at the issue." (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015))); *Harris v. Kijakazi*, 21-1853, 2022 WL 2987928, at *2 (4th Cir. July 28, 2022) (argument waived in social security appeal where plaintiff failed "to explain his argument or support it with citations to a voluminous record," which "render[ed] review impossible").

Feb. 25, 2022), *aff'd sub nom. May v. Comm'r of Soc. Sec. Admin.*, 22-1493, 2023 WL 2908812 (4th Cir. Apr. 12, 2023) (affirming ALJ's supportability analysis).[9]

### A. The ALJ Applied the Correct Legal Standard in Evaluating the Persuasiveness of Dr. Torres's Opinions

The ALJ's finding is not binding if it "was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987); *see Shelley C.*, 61 F.4th at 353 (ALJ's finding must be upheld if it was reached through application of the correct legal standard and supported by substantial evidence). In reaching a decision, the ALJ must "consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). There is, however, "no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)); *see also* 82 Fed. Reg. 5844, 5858 (explaining that the Commission "consider[s] all evidence" received, but standard for review "does not require written analysis about how [an ALJ] considered each piece of evidence"). Similarly, an ALJ "need only review medical evidence once in his decision"—there is no requirement to repeat relevant findings or restate record evidence multiple times. *McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (per curiam). Importantly, however, the ALJ's decision "must build an accurate and

---

[9] In *May*, the Fourth Circuit upheld the district court's ruling affirming the ALJ's decision, concluding that (1) "the ALJ applied the correct legal standards in evaluating [plaintiff's] claims, particularly in terms of analyzing the supportability and consistency of the proffered medical opinion evidence," and (2) "that the ALJ's factual findings are supported by substantial evidence." 2023 WL 2908812 at *1 (citing *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022) (recognizing that, under § 404.1520c, an applicant's "treating physicians are not entitled to special deference," and reviewing ALJ's analysis under this regulation for substantial evidence)). The undersigned takes the same analytical approach to the issue Plaintiff raises here.

logical bridge from the evidence to his conclusion." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also May*, 2021 WL 7286833, at *4 ("[A]n ALJ continues to have an obligation to 'include a narrative discussion describing how the evidence supports each conclusion.'" (quoting *Monroe*, 826 F.3d at 190)).

Plaintiff filed her disability claim after March 27, 2017, so a revised regulatory framework applied to the ALJ's evaluation of the medical opinions in the record. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01 (Mar. 27, 2017)). Under this framework, the ALJ does "not defer or give any specific evidentiary weight" to any one medical opinion, including that of a treating medical source; instead the ALJ must "articulate" the persuasiveness of each medical opinion after considering five factors: supportability, consistency, relationship with the claimant, specialization, and a catch-all "other." 20 C.F.R. § 404.1520c(a). The most important factors are supportability and consistency, and the ALJ must specifically explain how these factors were considered in assessing the persuasiveness of each medical opinion. 20 C.F.R. §§ 404.1520c(a), (b)(2). As relevant here, "supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions" will be. 20 C.F.R. § 404.1520c(c)(1).

Plaintiff asserts that "the ALJ's evaluation failed to comply with 20 C.F.R. § 404.1520c" because the ALJ's evaluation did "not adequately address the supportability factor." (Dkt. No. 19 at 7, 9.) Contrary to Plaintiff's argument, however, the ALJ applied the correct legal framework in analyzing the persuasiveness of Dr. Torres's opinions. Specifically, the ALJ first noted the following opinions from Dr. Torres:

1. Plaintiff is "capable of a light range of work but will be absent more than 3 times per week and will require greater than 3 daily breaks to deal with exacerbations of symptomology";

2. Plaintiff "can occasionally reach bilaterally, perform occasional gross manipulation with the right hand, and perform less than occasional fine manipulation with the right hand"; and

3. Plaintiff "should [sic] low traffic areas, use noise-cancelling devices, and have the opportunity to go to a calm/quiet area when needed due to her PTSD."  (AR 22.)

The ALJ then determined that Dr. Torres's opinions were "not well-supported" under 20 C.F.R. § 404.1520c(c)(1), including because her "treatment notes often show[ed] that the claimant was in no acute distress with normal extremity movement, good balance and gait, intact sensation, normal mood, and good memory without any noted manipulative limitations."  (AR 22.)  To support this conclusion, the ALJ cited three of Dr. Torres's treatment notes spanning a three-year period—from September 2018, July 2019, and September 2021.[10]  (AR 22 (citing AR 595–96, 786, 897).)  In other words, the ALJ's decision: (1) identified Dr. Torres's opinions; (2) specifically discussed the supportability factor; (3) restated Dr. Torres's own observations about Plaintiff from several of her treatment notes; (4) explained why those treatment notes did not support Dr. Torres's March 2022 opinions; and (5) provided citations to the record to support that conclusion.  (AR 22.)  The ALJ, therefore, properly "build[t] an accurate and logical bridge from the evidence to his conclusion," as required under 20 C.F.R. § 404.1520c.  *Monroe*, 826 F.3d at 189; *see* 82 Fed. Reg.

---

[10]  Plaintiff herself acknowledges that, "[w]hen discussing the supportability factor, the ALJ claimed that Dr. Torres'[s] opinions were not supported by her own notes.  *The ALJ then cited to the record to support that conclusion*."  (Dkt. No. 19 at 9 (emphasis added).)

5844, 5858 (analysis under 404.1520c intended to allow the "reviewing court to trace the path of [the ALJ's] reasoning").

Unsatisfied with the ALJ's supportability analysis, Plaintiff contends that the ALJ erred by citing only "three outlier treatment sessions" that did "not accurately document what Dr. Torres'[s] treatment as a whole represented" and otherwise "failed to address [the] evidence *supporting* Dr. Torres'[s] opinions." (Dkt. No. 19 at 10–11 (emphasis added).) As stated above, however, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid*, 769 F.3d at 865. Additionally, while the ALJ cited three of Dr. Torres's treatment notes to provide *examples* of observations she "often" made when treating Plaintiff (which, as the ALJ explained, generally undermined her March 2022 opinions (AR 22)), there is no indication that the ALJ relied *exclusively* on those three treatment notes when analyzing the supportability of Dr. Torres's opinions without considering the remainder of the evidence in the record, including Dr. Torres's other treatment notes. To the contrary, the ALJ provided an extensive and detailed summary of the record evidence—which itself included references to Dr. Torres's other treatment notes,[11] as well as a detailed discussion of the objective medical imaging (AR 18–20)—before evaluating the opinion evidence; the ALJ was not required to restate that evidence in full when discussing the persuasiveness of each medical source's opinion. *See John R. v. Kijakazi*, 2:22CV47, 2023 WL 2682358, at *4 (E.D. Va. Mar. 29, 2023) (finding no error in supportability analysis under 20 C.F.R. § 404.1520c(b)(2), noting analysis immediately followed earlier, more thorough discussion of plaintiff's medical history); *see also McCartney*, 28 F. App'x at 279

---

[11] For example, the ALJ cited a December 2020 treatment note from Dr. Torres indicating that Plaintiff was in no acute distress with normal extremity movement (AR 15, 20 (citing AR 479–81 (*cited as* Ex. 2F/163-165))), as well as a November 2021 occupational therapy treatment note that was received by Dr. Torres indicating no structural issues with Plaintiff's wrists and discharging her from therapy (AR 18 (citing AR 1325 (*cited as* Ex. 11F/44))).

("[T]he ALJ need only review medical evidence once in his decision.").  Although Plaintiff contends that the ALJ's supportability discussion could have been more thorough, Plaintiff otherwise does not argue that the ALJ applied an incorrect legal standard in evaluating Dr. Torres's opinion.

Accordingly, because the ALJ specifically analyzed the supportability of Dr. Torres's March 2022 opinions and explained his reasoning for finding that they were not well-supported—including by providing record citations to Dr. Torres's own treatment notes over a three-year period—the ALJ applied the correct standard under 20 C.F.R. § 404.1520c(a).

### B.  Substantial Evidence Supports the ALJ's Conclusion that Dr. Torres's Opinions Were "Not Well-Supported"

Plaintiff contends that because the ALJ did not "properly evaluate [the supportability] factor . . . this Court cannot find that the ALJ's evaluation was supported by substantial evidence." (Dkt. No. 19 at 11.)  As explained above, however, the ALJ applied the correct legal standard in analyzing the persuasiveness (and specifically, the supportability) of Dr. Torres's opinions.  In addition, the undersigned finds that substantial evidence—i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"—supports the ALJ's conclusion that Dr. Torres's opinions were not well-supported.  *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001).

As an initial matter, the three treatment notes expressly cited by the ALJ reasonably support his conclusion that Dr. Torres's March 2022 opinions were not well-supported.  (AR 22.)  As to Plaintiff's mental limitations, the treatment notes that the ALJ cited generally undermine Dr. Torres's opinion that managing Plaintiff's PTSD symptoms at work would require her to be isolated from people, use noise-cancelling devices, and be given an opportunity to go to a quiet area upon request.  (AR 22, 1558.)  For example, Dr. Torres's notes from Plaintiff's September

2018 and July 2019 in-person appointments indicate that Plaintiff was in "[n]o acute distress," had a "[n]ormal mood with NO anxiety/depression noted," and that her "[j]udgment and insight [were] fair/intact." (AR 595–96, 786.)   Dr. Torres's notes also show that Plaintiff declined a behavioral health referral at her September 2018 appointment (AR 784), and that Plaintiff reported her anxiety had "improved since Retirement" at her July 2019 appointment.   (AR 593.)   Dr. Torres's September 2021 notes detailing her telephone encounter with Plaintiff reflect that Plaintiff was "very hopeful for positive changes" as a result of her upcoming psychiatry treatment, and that, at that time, Plaintiff was also in a normal mood with no anxiety or depression noted, with fair/intact judgment and insight, and good memory.   (AR 896–97.)  The ALJ reasonably concluded that these observations were inconsistent with Dr. Torres's March 2022 opinion regarding the severity of Plaintiff's PTSD symptoms.

As to Plaintiff's physical limitations, the ALJ also reasonably concluded that Dr. Torres's notes do not support her opinion that Plaintiff would have limitations with reaching or manipulation, such that she could only "occasionally reach bilaterally, perform occasional gross manipulation with the right hand, and perform less than occasional fine manipulation with the right hand."   (AR 22, 1557.)   Specifically, notes from Plaintiff's September 2018 and July 2019 in-person appointments each indicated that Plaintiff had "[g]rossly normal movement" of her extremities "with intact sensation" and "good balance/coordination, and gait."   (AR 595, 786.) Although Dr. Torres's September 2021 telephone encounter notes reflect that Plaintiff had a tear and effusion in her right *ankle* (AR 896), that observation does not support Dr. Torres's opinions regarding Plaintiff's *upper* extremity limitations.   *Cf. Boughaleb v. Comm'r of Soc. Sec.*, 121CV1202RDAJFA, 2022 WL 2387728, at *2 (E.D. Va. June 30, 2022) (ALJ's conclusion regarding supportability was supported by substantial evidence where doctor opined that plaintiff

"had 'extensive exertional and postural limitations,' [but] his treatment records 'noted normal neurological findings and lacked any musculoskeletal testing to support these limitations'").

In light of this, Plaintiff contends that the three treatment notes cited by the ALJ are "outliers" that do not accurately represent Dr. Torres's overall treatment of Plaintiff.  (Dkt. No. 19 at 10); *see Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (ALJ may not cherry-pick facts that support a finding of nondisability while ignoring those supporting disability).  A careful review of the record, however, demonstrates that these treatment notes are generally consistent with many of Dr. Torres's other treatment notes, which further supports the ALJ's conclusion.

For example, during a December 2020 virtual appointment, Dr. Torres noted that Plaintiff reported joint and back pain, but that Plaintiff was in no acute distress, had grossly normal movement of her extremities, was in a normal mood, and was alert and oriented with no anxiety, depression, or unusual stress noted.  (AR 529, 531.)  Dr. Torres also noted that Plaintiff's ongoing anxiety was being addressed through behavioral health counselling.  (AR 529, 532.)  In notes from a July 2021 telephone encounter with Plaintiff, Dr. Torres reported that Plaintiff had a relatively low pain level (3), which, she noted, "represents a baseline condition which is being actively treated to the satisfaction of the patient," including through physical therapy.[12]   (AR 912.)  Similarly, in October 2021, Plaintiff reported to Dr. Torres that her TENS unit was helping with her pain, and in January 2022, Plaintiff reported to Dr. Torres that chiropractic treatment and physical therapy were also helpful with her pain symptoms.[13]  (AR 1298, 1327.)  Accordingly,

---

[12] On the other hand, Dr. Torres indicated that Plaintiff was experiencing increased anxiety due to live fire training at Quantico nearby her home (for which Dr. Torres prescribed a trial of Hydroxyzine), which tends to support her opinions that Plaintiff had mental limitations.  (AR 911–12.)

[13] Dr. Torres also opined that Plaintiff's "disabilities and treatment schedule would require absences from work . . . . [m]ore than three times weekly."  (AR 1557.)  However, Dr. Torres's

these notes and observations—although not expressly cited in the ALJ's supportability analysis—are largely consistent with the three notes that the ALJ did cite, and further support the ALJ's conclusion that Dr. Torres's March 2022 opinions were not well-supported.

Finally, Plaintiff argues that the ALJ failed to consider that Dr. Torres had access to objective medical imagining that supported her opinions. (*See* Dkt. No. 19 at 10.) But as explained above, the ALJ's decision *did* provide a review of the objective medical imaging, including that which was available to Dr. Torres. (AR 18–21.) In any event, the September 2021 treatment note specifically cited by the ALJ (AR 22, 896) was from a telephone call during which Dr. Torres and Plaintiff reviewed her August 31, 2021 radiology report—i.e., the *exact* objective medical evidence that Plaintiff relies on to support her claims. (*See* AR 22; Dkt. No. 19 at 10 (citing AR 903–04).) Importantly, that note reflects Dr. Torres's contemporaneous statements about the imaging as well as directives to Plaintiff regarding symptom management.[14]   (AR 896–98.) Plaintiff is thus incorrect that the ALJ ignored the objective medical imaging that was available to Dr. Torres and otherwise supported her opinions. (Dkt. No. 19 at 10.)

In sum, substantial evidence supports the ALJ's conclusion that Dr. Torres's opinions were not well-supported; therefore, even if Plaintiff is correct that some record evidence would support Dr. Torres's opinions, the Court may not "substitute [its] judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th

---

notes from just one day prior directly contradict this opinion because they indicate that Plaintiff attended physical therapy and/or occupational therapy only *one to two* times weekly. (AR 1561.)

[14] On September 1—just two days earlier—Dr. Torres forwarded the August 31, 2021 radiology report to Plaintiff and recommended that, until Plaintiff could be seen by a specialist, she should continue with conservative treatment, including stretching, maintaining a healthy weight, and engaging in regular low- or no-impact exercise. (AR 903.) Similarly, on October 17, 2021, Dr. Torres forwarded the results of Plaintiff's right knee MRI to her and recommended that Plaintiff "continue with conservative management." (AR 1334.)

Cir. 2015) ("An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." (quoting *Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir. 1988))); *Brian A.H. v. Kijakazi*, 3:20-CV-00654 (JAG), 2021 WL 6496558, at *7 (E.D. Va. Dec. 29, 2021), *report and recommendation adopted*, 3:20CV654, 2022 WL 129127 (E.D. Va. Jan. 13, 2022) ("[E]ven if the allegedly contradictory evidence Plaintiff highlights could support a different result, the court's role is not to second-guess the ALJ's findings"); *cf. May*, 2021 WL 7286833, at *9 (D.S.C. Oct. 6, 2021) (affirming ALJ's decision, noting that even if ALJ's discussion "could have been more thorough, substantial evidence ultimately supports the ALJ's persuasiveness evaluation"). The ALJ's conclusion regarding the supportability of Dr. Torres's opinion should be affirmed.

## V.    CONCLUSION

Based on the foregoing, the undersigned recommends that the Court **DENY** Plaintiff's Motion for Summary Judgment (Dkt. No. 18), **GRANT** Defendant's Motion for Summary Judgment (Dkt. No. 21), and **AFFIRM** the ALJ's decision denying benefits for the period of June 1, 2018 through the date of the ALJ's decision on May 10, 2022.


## <u>NOTICE</u>

Failure to file written objections to this Report and Recommendation within fourteen (14) days after being served with a copy of this Report and Recommendation may result in the waiver of any right to a *de novo* review of this Report and Recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

**ENTERED** this 6th day of July, 2023.

/s/ *LRV*

Lindsey Robinson Vaala
United States Magistrate Judge

_____

Lindsey Robinson Vaala
United States Magistrate Judge

Alexandria, Virginia